## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

LOUISE M. DUVALL,                     )
                                      )
                Plaintiff,            )
vs.                                   )          NO.  CIV-09-1362-HE
                                      )
THE PUTNAM CITY SCHOOL                )
DISTRICT, INDEPENDENT SCHOOL          )
DISTRICT NO. 1 OF OKLAHOMA            )
COUNTY, ET AL.,                       )
                                      )
                Defendants            )

## ORDER

In this removed case,[1] plaintiff Louise M. Duvall, formerly a teacher with defendant

Putnam City School District ("District"), has sued the school district and the principal and

assistant principal who were her supervisors.  Plaintiff asserts discrimination and retaliation

claims under the Age Discrimination in Employment Act ("ADEA") and retaliation claims

under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against the

school district.  She alleges all defendants violated her First Amendment rights.  Defendants

have moved for summary judgment, which is appropriate only "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed.R.Civ.P. 56(a).  The court has viewed the evidence and any reasonable

inferences that might be drawn from it in the light most favorable to plaintiff, the nonmoving

party, and concludes defendants' motions should be granted.

---

[1]*The case was originally filed in state district court.*

Background[2]

During the 2007-08 school year plaintiff, who was employed by the District as a special education teacher, taught learning disabilities at Tulakes Elementary School. Plaintiff's job duties included preparing Individual Education Plans ("IEP's") for children with disabilities, conducting IEP meetings,[3] ensuring compliance with state and federal laws, and documenting disagreement with IEP's. Defendant Marjorie Iven, who at that time was assistant principal at Tulakes and in charge of Tulakes' special education program, was plaintiff's supervisor. Leander Roland, the principal of Tulakes since August, 2004, supervised both Ms. Ivens and plaintiff. Glen Kastner was the Executive Director of Special Services.

The parties' submissions indicate the District has transitioned over the past few years to more of a "full inclusion" model for providing special education services. This model involves having special education teachers assist in the classrooms and co-teach, with the students receiving special education services spending more time in the regular classroom with age appropriate peers. The inclusion model is apparently designed to encourage teachers, both special education and regular, to work together as a team. However, the roles

---

[2]*The factual statements in the motions filed by the District and the individual defendants are essentially identical, as are plaintiff's responses to them. Except as indicated, the background facts and circumstances are substantially undisputed.*

[3]*According to the unofficial draft copy of the 2007 Policies and Procedures for Special Education in Oklahoma, attached to plaintiff's response as Exhibit 2, parents and school personnel participate in an IEP meeting or meetings to "jointly make decisions about an educational program for a child with a disability." Id. at p. 120.*

played by special education teachers in implementing the inclusion model vary from school to school. Principals have discretion to determine the practices that best fit the needs of their schools.

In implementing the inclusion model and Literacy First programs at Tulakes,[4] Iven asked plaintiff to work as a reading interventionist with multiple flex groups,[5] which included both special and regular education students, during the 2007-08 school year.[6] Prior to that school term, plaintiff had spent half a day in classrooms working with flex groups and half a day providing pull-out services[7] in her own classroom. Plaintiff sought guidance from her superiors because she was worried about complying with federal and state laws governing the provision of special education services. Specifically, she was concerned about the discontinuance of pull-out services and believed she was not being allowed to provide support services the children needed. See District's Exhibit 12. Plaintiff sent several emails to her superiors and met with Kastner a couple of times to discuss her concerns. Kastner

---

[4]*Literacy First is an instructional approach that uses flex groups to help students increase their literacy skills. District Fact #15.*

[5]*A flex group is a small group of children needing help with a particular skill.*

[6]*Plaintiff disputes this statement (District Fact #21), stating that she "believes her concerns about not being allowed to provide appropriate services to her IEP students is addressed in an e-mail dated September 11, 2007 8:43 am." Plaintiff's response, pp. 8-9, ¶21. However, as with certain of plaintiff's other responses to asserted facts, her response does not really controvert the District's assertion. The court's analysis considers only those properly supported responses which substantially address the matters to which they are directed.*

[7]*Special education teachers provide pull-out services to special education students by removing them from their regular classrooms and bringing them to the teachers' special education classrooms for one-on-one or small group instruction.*

"assured her that he did not believe there were any legal problems."  District Fact #27.

Plaintiff subsequently wrote Kastner on October 3, 2007, requesting a written statement that she would not be breaking state or federal guidelines by complying with the assignment changes Iven had made.  The changes included "[n]o academic pullout services for IEP students" that year, required plaintiff to "[r]ewrite all the IEP's to reflect no academic pullout services," and required plaintiff to do her special education job before and after school and on her  plan time and to schedule IEP conferences with parents before school and after 2:00 p.m.  District's Exhibit 14.   Kastner responded with a four page letter dated October 11, 2007.  He explained his views of the legality of the District's actions and assured plaintiff that the District was in compliance with federal law.  He also told her that as long as she performed her assigned duties in good faith she had no reason to be concerned.  If the District was found to be in non-compliance, Kastner stated, then the administration would be held responsible, not plaintiff.  District's Exhibit 4.

Plaintiff submitted letters of dissent to most of the IEPs with which she was involved during the 2007-08 school year.   The District asserts the letters reflected plaintiff's disagreement with the new inclusion model.  Plaintiff agreed that she voiced her concerns regarding the legality of the changes in her teaching assignment to her administrators and through her letters of dissent.  District Fact #47.  Plaintiff asserts she "believed that the blanket directive to remove all IEP students from pull-out services was more of a model convenience decision instead of what was best for each individual IEP student."  Plaintiff's response, p. 10, ¶30.

On October 25, 2007, Iven issued plaintiff a Letter of Admonishment, which stated:

Thursday morning, October 11, 2007, an unfortunate incident occurred during an IEP. You presented the IEP in a manner that was disconcerting to the parents and team members. A letter of complaint was received the following day regarding the outcome of the proceedings.

The individual felt blind-sided and uninformed as to the content of the IEP, the lack of support offered, and the surprise at the need for the letter of dissension. The individual felt the meeting was misrepresentative and unprofessional.

For all members of the IEP team, every effort needs to be made to deliver a positive, congruent plan. It is imperative that you are professional and a team player. Surreptitious behavior must cease.

Your failure to comply may result in a recommendation for termination or non-renewal of your contract.

District's Exhibit 16. The District claims the admonishment was written because of the manner in which plaintiff had conducted an IEP meeting and presented her letter of dissent, not because of, or in retaliation for, plaintiff's letter of dissent. Plaintiff admitted during her deposition testimony that the admonishment was not about a letter of dissent, but how plaintiff "presented information at an IEP that supposedly offended the classroom teacher that was there." District's Exhibit 1, plaintiff's deposition, p. 124.[8] However, plaintiff "believes that putting in writing the threat of 'termination or non-renewal' for 'failure to comply' to the 'full inclusion model' and for Plaintiff following State and Federal Guidelines

_____

[8]*An email plaintiff sent to Iven dated October 26, 2007, confirms that the concern addressed in the Letter of Admonishment was the* _manner_ *in which plaintiff had presented her letter of dissent. Plaintiff's Exhibit 029.001 ("Yesterday when you presented me with the Letter of Admonishment, I did not get definitive answer as to how to proceed with my Letter of Dissent, which appears to be in question."). See also Plaintiff's Exhibit 030.001. Iven subsequently advised plaintiff that she could continue to submit the letters or include them in the IEP conference. District's Exhibit 5, ¶24; plaintiff's Exhibit 030.001.*

is retaliation against Plaintiff for answering a parent's question in regards to services for her child and giving the parent a copy of her letter of dissent." Plaintiff's response, pp. 12-13, ¶33.[9]

Plaintiff was specifically advised by Iven that "there would be no problem with [her] submitting letters of dissent." District's Exhibit 1, p. 121. Plaintiff also knew that state policy authorized teachers who disagreed with an IEP to submit a written statement expressing their disagreements or concerns. *See* plaintiff's Exhibit 028.001 ("I have consulted with State Department of Education Personnel and have studied the directives in the Policy and Procedures Manual for Special Education in Oklahoma, (Unofficial Draft Copy 2007). Both sources provided the direction I followed in writing my Letter of Dissent.").

Roland decided in May, 2008, to transfer plaintiff from her special education position to a first grade teacher position for the following (2008-09) school year. At that time plaintiff was fifty-seven years old. He testified that "[i]t was evident that [plaintiff] did not agree with District's transition to a more inclusive model of serving special education students and that she was discontented in her current position as a special education teacher." District's

---

[9]*The 2007 edition of the Oklahoma State Department of Education Policies and Procedures for Special Education in Oklahoma Manual contemplated possible disagreement among team members and provided a comment form that could be used to express "disagreements or concerns." District's Exhibit 15. Plaintiff indicates in her response that the 2007 edition was not issued to special education teachers until after November 2, 2007. However, the draft edition she states she had a copy of in the fall of 2007, plaintiff's Exhibit 2, includes the same comment form as District's Exhibit 15 and statement regarding an IEP team member's ability to express his or her disagreement with the IEP. Plaintiff's Exhibit 2, p. 309; comment form.*

Exhibit 5.  From his discussions with plaintiff about her concerns with the more full inclusion model of special education instruction, Roland concluded she was uncomfortable implementing the model.  He stated plaintiff also was unhappy about no longer having her own classroom.  Defendants' submissions indicate Roland believed plaintiff would be happier and more comfortable as a first grade teacher and that the move would benefit her, the students and the school.

Pursuant to its contract with plaintiff and its collective Bargaining Agreement with its teachers, the District was authorized to reassign certified teachers "to other positions and/or change any specific duties and responsibilities ... provided that any such reassignment and/or change in duties shall be according to any applicable provision of law, regulation, or policy."  District's Exhibits 2; 4.[10]  School administrators have authority to transfer teachers within their buildings to meet the needs of the school,[11] and Roland made staffing changes yearly. [12]  Although the District asserts that special education and regular education positions are lateral positions, special education teachers' salaries are 5% higher than the salaries of regular education teachers.

While plaintiff does not deny that she was unhappy with her job and uncomfortable

---

[10]*Although plaintiff has demonstrated that special education teachers are paid five percent more than other teachers, the submissions do not suggest a basis for concluding that she could not be reassigned due to the pay differential.*

[11]*Plaintiff misconstrued District Fact #38.  The District was asserting that a principal could transfer staff within his or her building, not between schools.*

[12]*Plaintiff did not challenge Roland's authority to transfer teachers at Tulakes, but questioned the soundness of the changes he made with respect to her position.*

with carrying out the District's education model,[13] she believes the reassignment was discriminatory and retaliatory. She states that she "told her administrators that she was not interested in losing her extra 5% compensation and she was requesting a transfer form for the second time." Plaintiff's response, p. 13, ¶35. She also cites an email she sent Kastner on April 29, 2008, in which she relays her conversation with Roland and asks for Kastner's help in finding another position.

Plaintiff testified that she believed her age factored into her transfer because the District thought a younger, less experienced teacher would be more pliable and less likely to challenge instructions. Her submissions indicate that another teacher called plaintiff a "dinosaur" once, but do not include any suggestion that Roland or Ivan made comments to plaintiff about her age or asked about her retirement plans.

Roland and Iven claim they first learned that plaintiff had filed a charge of age discrimination with the EEOC when this lawsuit was filed. Plaintiff disputes this, asserting that a Formal Grievance Complaint she filed on April 16, 2009, includes examples of Roland's "intensified discrimination and retaliation against her." Plaintiff's response, p. 18, ¶46. That document, plaintiff's Exhibit 052.001, includes what plaintiff refers to as four different instances of retaliatory treatment: "1) Not approving or denying my use of an Association day. Then changing it to a Personal Business after the fact; 2) Calling me to the

---

[13]*Plaintiff testified that she "was not happy with the conditions of working in what [she] believe to be illegal." District's Exhibit 1, p. 171. She also stated that Roland "probably in his mind was correct" when asked if Roland was correct in believing that she was not happy with her assignment during the 2007-08 school year. Id. at pp. 171-72.*

office for missing a social function that was later changed to a Faculty Meeting/Teacher of the Reception; 3) Initial refusal to provide me a true copy of my evaluation during my post-conference and walking out of the conference; and 4) Scheduling the informal meeting with Dr. Grace and Eric Winkle during my plan time and not arranging coverage for my students to enable me to get to the meeting on time.[14]

By letter dated April 22, 2009, plaintiff submitted her resignation to Dr. April Grace, the executive director of human resources.[15] She filed this lawsuit a couple of months later.

Analysis

At the center of this case is a disagreement about educational philosophy – how best to educate students with disabilities.[16] As plaintiff explained in her deposition, "in my opinion I was not allowed to function as a special ed teacher." District's Exhibit 1, p. 166. While all educators presumably have the same goal – to provide the best education possible

---

[14]In the response plaintiff sent to Roland and Dr. Grace regarding her March 31, 2009, evaluation, plaintiff's Exhibit 059.001-.002, plaintiff states she had spoken with other teachers who were not required to turn in individual weekly Flex Lesson Plans. However, as plaintiff does not identify those teachers or show they were similarly situated, she fails to provide sufficient information to demonstrate the District discriminated or retaliated against her by requiring her to turn in the lesson plans.

[15]In her response brief, plaintiff asserts that her resignation was involuntary. She states that she believes she was constructively discharged from the special needs position because she advocated for "appropriate services for her students [and] exercis[ed] her First Amendment Rights by speaking out about practices that she felt were illegal ...." Plaintiff's response, p. 18, ¶ 48. The evidence plaintiff has proffered falls far short of what is required to show constructive discharge. See MacKenzie v. City & County of Denver, 414 F.3d 1266, 1281 (10th Cir. 2005) ("Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit.").

[16]See, e.g., plaintiff's response to District Fact #24 ("The 'full inclusion model' should not be the only service model provided.").

9

for each child – they sometimes differ as to the most effective method of attaining it. When selecting an educational approach, a variety of considerations may impact the determination, including the needs of the child, the needs of his or her fellow students and the system's ability to meet those needs. The court's job in this case is not to determine which educational method is superior, but whether the plaintiff, who clearly is a dedicated, concerned educator, was retaliated or discriminated against contrary to federal law.

ADEA Discrimination

The ADEA makes it "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1). Plaintiff claims the District discriminated against her on the basis of age by demoting her and replacing her with a younger, less experienced teacher.

To prevail on her ADEA claim the plaintiff "must prove that age was the 'but-for' cause of the employer's adverse decision.'" Gross v. FBL Fin. Servs., Inc., ___ U.S. ___, ___ 129 S.Ct. 2343, 2350 (2009). She must ultimately establish that the District would not have taken the challenged action but for her age. Jones v. Oklahoma City Pub. Sch., 617 F.3d 1273, 1277 (10th Cir. 2010).[17] At the summary judgment stage, and because plaintiff has not submitted direct evidence of discrimination, her claim is analyzed under the

_____

[17]*Contrary to the District's assertion, Jones does not hold that "age has to be the sole cause of the adverse employment action." District's motion, p. 13. What the Tenth Circuit stated in Jones was that "Gross does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action." Jones, 617 F.3d at 1278.*

McDonnell Douglas[18] burden-shifting framework. Simmons v. Sykes Enterprises, Inc., ___ F.3d ___, ___ 2011 WL 2151105, *3 (10th Cir. 2011). Under that framework, the plaintiff must first make out a prima facie case, i.e. produce evidence sufficient to create a material dispute as to each element of the prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Once the plaintiff does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. *Id.*; Simmons, ___ F.3d at ___. If the defendant makes this showing, the plaintiff must then produce evidence that the defendant's justification is pretextual. McDonnell Douglas , 411 U.S. at 804; Simmons, ___ F.3d at ___.

Insofar as plaintiff's ADEA claim for disparate treatment (i.e. her alleged wrongful reassignment) is concerned, plaintiff must show that (1) she is within the protected age group; (2) she was doing satisfactory work; (3) she was demoted; and (4) her position was filled by a younger person. Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).[19]

The District argues that plaintiff cannot establish a prima facie case because she

---

[18]*McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973).*

[19]*The District suggest the elements of a prima facie case are (1) that plaintiff was a member of a protected class, (2) that she suffered an adverse employment action, and (3) that the adverse action occurred under circumstances giving rise to an inference of discrimination, relying on Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177 (10th Cir. 2002) and other cases to the same effect. The appellate cases are not entirely consistent in their description of the elements of a prima facie case in various contexts, but the differences in the formulation does not affect the result here. The element of "position filled by a younger person" is just a more specific application of the "giving rise to an inference" standard.*

cannot show she was demoted or suffered an adverse employment action. However, "'[t]he Tenth Circuit liberally defines the phrase "adverse employment action." Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, [the appellate court] take[s] a "case-by-case approach," examining the unique factors relevant to the situation at hand.'" Jones, 617 F.3d at 1279 (quoting Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir.1998)). While the District characterizes plaintiff's reassignment as merely being a lateral transfer, the court concludes a five percent salary reduction when combined with different job responsibilities could be considered a "'significant change in employment status,'" and/or a "'significant change in benefits.'" Jones, 617 F.3d at 1279 (quoting Hillig v. Rumsfeld, 381 F.3d 1028, 1032-33 (10th Cir.2004)). See generally Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005) (Title VII "Plaintiffs' burden in articulating a prima facie case is slight."). Plaintiff has made a sufficient showing as to the adverse action requirement.

The District also contends plaintiff's prima facie case fails because "the circumstances surrounding her lateral transfer do not support an inference of discrimination based on age." District's motion, p. 19. However, the District ignores the fact that plaintiff was replaced by a younger teacher. See Rivera, 365 F.3d at 920. Plaintiff has met her burden of establishing a prima facie case of age discrimination, so the burden shifts to the District to articulate some legitimate, nondiscriminatory reason for its action.

The District has produced evidence that Tulakes' principal transferred plaintiff for a legitimate reason – because he believed she would be happier and feel more comfortable as

a regular classroom teacher and would best serve the school in that position. The District's justification for reassigning plaintiff satisfies "its 'exceedingly light' burden under McDonnell Douglas and shift[s] the burden back to [ plaintiff] to show that [the District's] proffered justification was merely a pretext for .... [age] discrimination." Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165-66 (10th Cir. 2007).

"'A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.'" Id. at 1166 (quoting Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir.2003)). The inquiry is "'whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, or whether plaintiff can show that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination.'" Simmons, __ F.3d at ___ (quoting Young v. Dillon Cos., Inc., 468 F.3d 1243, 1250 (10th Cir.2006)). The court must "'examine the facts as they appear to the person making the decision,' to determine whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'" Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1220 (10th Cir. 2007) (quoting Rivera, 365 F.3d at 924-25). The court "does not review the wisdom or fairness of the employer's proffered reasons." Id. "'The pertinent question in determining pretext is not whether the employer was right ... but whether that belief was genuine or pretextual.'" Zamora, 478 F.3d at 1166 n.10 (quoting Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000).

Plaintiff did produce evidence of a comment that she suggests was ageist. However, it is less than obvious that someone's reference to plaintiff being a "dinosaur" was a reference to her age. In the context of the circumstances here, the more plausible inference is that the comment suggested plaintiff was advocating an educational theory that was out of fashion or no longer the best educational approach. In any event, the comment was not made by a decisionmaker and plaintiff failed to show any link, temporal or otherwise, between that isolated remark and the decision to reassign her. *See* <u>McKnight v. Kimberly Clark Corp.</u>, 149 F.3d 1125, 1129 (10th Cir. 1998 ) ("In <u>Cone</u>, we held that 'age-related comments by non-decision makers are not material in showing the [employer's] action was based on age discrimination.'") (quoting <u>Cone v. Longmont United Hosp. Ass'n</u> 14 F.3d 526, 531 (10th Cir 1994)). Plaintiff offered little else to show that the District's justification was a pretext or that age was a determinative factor in the decision to transfer her. Although she refers to multiple emails as evidence of an intent to discriminate or retaliate, plaintiff's response, p. 14, ¶36, plaintiff's Exhibits 009.001; 11.001; 18.001;18.002, they do nothing more than demonstrate plaintiff's dissatisfaction with the changes in the special education model being implemented by her school. The fact that plaintiff had successfully served Tulakes for 25 years as a special needs educator also does not demonstrate that the District's justification for the action it took was pretextual. Similarly, plaintiff's belief that the administration replaced her with a younger teacher because "a younger teacher is more pliable," District's Exhibit 1, p. 128, is insufficient to create a factual dispute as to the

District's reason for the reassignment.[20]     The evidence in the record is insufficient to support an inference of pretext.

The result is that plaintiff has not made the showing of a causal link between her transfer and her age necessary to a successful ADEA claim. The District is therefore entitled to summary judgment on plaintiff's age discrimination claim.

ADEA Retaliation

Plaintiff asserts that after she filed her age discrimination complaint with the EEOC, the District retaliated against her. She alleges that after March 17, 2009, she was "repeatedly subjected to a hostile work environment and unequal terms and conditions of employment by Defendant in that ... Plaintiff [was] subjected to surprise visits by other co-workers, ordered by Defendant Roland, wherein they observed her work ... [and] was the only teacher, to her knowledge, who was required to turn in weekly Flex Group lesson plans to Mr. Roland." Amended petition, ¶66. [21] Other claimed retaliatory acts are cited in plaintiff's April 16, 2009, Formal Grievance Complaint, Plaintiff's Exhibit 052.00.[22] They include an

---

[20]*Plaintiff has to offer some evidence from which a reasonable factfinder could rationally find the District's explanation for its action to be "unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."* EEOC v. C.R. England, Inc., *644 F.3d 1028, ___ (10th Cir. 2011) (internal quotations omitted). Her assertion that "[t]he reason stated by Mr. Roland for reassigning Plaintiff begs to be heard and evaluated by a Jury..." plaintiff's response, p. 21, is insufficient to create a fact dispute as to retaliatory intent.*

[21]*In her amended petition plaintiff also alleged other retaliatory conduct, but the conduct predated the filing of her EEOC complaint.*

[22]*See supra page 9. Roland responded to plaintiff's grievance by letter dated April 21, 2009. Plaintiff's Exhibit 055.001.*

15

issue regarding leave approval, plaintiff's being called in for missing a meeting by mistake, Roland's failure to provide plaintiff with a "true copy" of her evaluation and his abrupt departure from a conference, and a scheduling issue.

To establish a prima facie case of retaliation under the ADEA, plaintiff must show that: (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have considered the challenged employment action materially adverse; and (3) there was a causal connection between the protected activity and the materially adverse action. Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1202 (10th Cir. 2008).[23]  The District claims plaintiff cannot establish a prima facie case as she cannot show that it took actions between the time plaintiff filed her EEOC complaint and the time her employment ended that could be considered "materially adverse to a reasonable employee."  Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  It also asserts plaintiff cannot establish the required causal connection between her protected conduct and reassignment because she has not produced evidence suggesting that those who allegedly retaliated against her knew she had filed an EEOC complaint.

Plaintiff does not explicitly address the District's argument that she did not suffer a materially adverse action subsequent to filing her EEOC complaint.  Although she references an earlier potential charge of employment discrimination, she provides no proof that a formal

---

[23]*Plaintiff's ADEA retaliation claim also is analyzed under the McDonnell-Douglas burden-shifting framework.  See Hinds, 523 F.3d at 1201 (in the absence of direct evidence of retaliation, "the McDonnell Douglas burden-shifting scheme again pertains").*

charge was ever filed or that the District was notified of that complaint. The evidence offered, a letter dated October 6, 2008, to plaintiff from the EEOC, merely confirms the agency's receipt of correspondence from plaintiff "related to a potential charge of employment discrimination." Plaintiff's Exhibit 9. As the only evidence of "protected conduct" plaintiff has submitted consists of her March 17, 2009, EEOC charge, the only conduct that is pertinent to plaintiff's retaliation claim is that which occurred after March 17, 2009.[24]

The court concludes that the District's alleged actions, consisting principally of the conduct cited in plaintiff's April 16, 2009, grievance, whether considered alone or in the aggregate, were not "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 57. The requirement that a plaintiff, to recover for retaliation, have suffered a materially adverse action was intended "to separate significant from trivial harms," *id.* at 68, the latter being "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* A reasonable jury could not view the post-charge actions plaintiff cites as materially adverse.

However, even if plaintiff had met her burden of showing the necessary adverse employment action, she failed to refute the District's evidence that neither Roland nor Iven were aware of her EEOC complaint until she filed this lawsuit. Plaintiff's conclusory

---

[24]*Plaintiff received the letter of admonishment and was transferred before she filed her EEOC charge.*

statement that she "believes that if Mr. Roland had not known about the 'EEOC' complaint received at the 'District's Administration Building' in the middle of March, he would not have acted as he did," plaintiff's response, p. 17, ¶ 46, does not controvert defendants' affidavits and the mere filing of a complaint, in the circumstances existing here, does not support an inference that Roland or Iven must have known of it. Plaintiff's supposition that, because Roland was named in the EEOC complaint, his supervisors would have informed him of the filing is insufficient to meet plaintiff's burden of coming forward with evidence from which a reasonable factfinder could conclude that Roland and Iven had knowledge of plaintiff's protected activity. Hinds, 523 F.3d at 1203. Conclusory expressions of personal belief, without reference to supporting evidence, are insufficient to support an inference of retaliation.

As plaintiff has failed to present evidence sufficient to make a prima facie showing of the necessary causal connection, the District is entitled to summary judgment on plaintiff's ADEA retaliation claim.[25]

ADA and Rehabilitation Act Retaliation[26]

Plaintiff alleges the District retaliated against her in violation of the ADA and Section 504 of the Rehabilitation Act for participating in the "protected activity of advocating for the

---

[25]*Assuming plaintiff had established a prima facie case of ADEA retaliation, the District still would be entitled to summary judgment as plaintiff did not, as discussed elsewhere, produce evidence sufficient to support a showing of pretext.*

[26]*The individual defendants address plaintiff's Section 504 claim in their brief. However the court previously dismissed plaintiff's Rehabilitation Act claim against the individual defendants. Order, March 26, 2010.*

special needs children." Plaintiff's Amended petition, ¶¶ 57, 61. Her alleged advocacy included "question[ing] the administrators at Tulakes Elementary and the Special Education Director about orders to rewrite IEP's for all special needs children to reflect no pull out services." *Id*. at ¶ 55. The alleged retaliation includes her reassignment to a first grade teaching position and the October 25, 2007, letter of admonishment.

The <u>McDonnell Douglas</u> burden shifting framework applies to plaintiff's retaliation claims asserted under the ADA and the Rehabilitation Act. *See* <u>Jarvis v. Potter</u>, 500 F.3d 1113, 1125 (10th Cir. 2007). To establish a prima facie case of retaliation under both statutes, "the employee must show '(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action.'" *Id.* (quoting <u>Doebele v. Sprint/United Mgmt. Co.</u>, 342 F.3d 1117, 1135 (10th Cir.2003)). The District concedes for purposes of its motion for summary judgment that plaintiff engaged in protected activity, but argues that she cannot establish she suffered an adverse employment action or that such action was causally connected to her speech. As discussed above, the reassignment of plaintiff to a lower paid position is sufficient to make the necessary showing of adverse action at this stage.[27]

---

[27]*It appears the letter of admonishment to which plaintiff refers would not constitute adverse action in the circumstances here. Plaintiff admitted that she was admonished because of the inappropriate manner in which she presented a letter of dissent. The admonishment did not affect her employment or alter her workplace conditions. See* <u>*C.R. England, Inc.*</u>*, 644 F.3d at ___ ("In general, [o]nly acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action.") (internal*

Insofar as the requirement of a causal connection is concerned, the evidence suggests plaintiff continued throughout the 2007-08 school year to voice her concerns about the District's change in method of providing special education services through her letters of dissent to various IEP's.[28] As her reassignment was relatively close in time to at least some of the dissenting letters or similar objections raised by plaintiff, the court concludes a sufficient showing of this element has been made and the necessary prima facie showing made.

Plaintiff has not, however, produced evidence showing that the District's proffered reasons for its decision to reassign her were pretextual. For largely the same reasons as were discussed above in connection with the ADEA claims, the court concludes plaintiff has not demonstrated "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" C.R. England, Inc., 644 F.3d at ___ (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.1999)). "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." Id. (internal quotations omitted). As plaintiff has failed to make a sufficient showing of pretext as to the reasons for her transfer to the first grade teaching position,

_____

quotations omitted).

[28]While the record reflects that plaintiff attached letters of dissent to almost every IEP involving her students, it does not indicate the date of her last letter.

summary judgment in the District's favor is warranted as to plaintiff's ADA and Rehabilitation Act retaliation claims.

First Amendment Retaliation

Plaintiff's remaining claim, asserted against all defendants, is based on their alleged violation of her First Amendment rights. She contends she "engaged in political speech on a matter that was of interest to the public when she advocated for the rights of special needs students and criticized the policies of the Defendant School District in misappropriating government funds and not providing the educational opportunities to special needs students as required under federal law." Amended Petition, ¶48. Defendants assert that plaintiff's speech was not protected, that she did not suffer an adverse employment decision and that she cannot show that their asserted retaliatory actions were "substantially motivated" by her voicing her concerns about the provision of services to special education students.

"The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). They have a constitutional "right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.*

To determine whether defendants retaliated against plaintiff in violation of her First Amendment rights, the court applies "the Pickering test, now modified by the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006)." Dixon v. Kirkpatrick, 553 F.3d 1294, 1301-02 (10th Cir. 2009). "The test comprises five elements, called 'prongs': (1) whether the speech was made pursuant to an employee's official duties; (2) whether the

speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. The first three 'prongs' are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the factfinder." *Id.* at 1302 (internal citation omitted).

In evaluating plaintiff's claim, "it is essential to identify the speech which resulted in the alleged retaliation." Hulen v. Yates, 322 F.3d 1229, 1237 (10th Cir. 2003). Plaintiff bases her First Amendment claim on her communications with her superiors regarding her concerns about the District's decision to transition towards a full inclusion model of providing services for special education students. She does not rely on her letters of dissent, which clearly would fall within her official duties and not be accorded First Amendment protection under Garcetti. *See* Garcetti, 547 U.S. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); Thomas v. City of Blanchard, 548 F.3d 1317, 1323 (10th Cir. 2008).

The initial issue is whether plaintiff was speaking as a member of the general public or pursuant to her job duties when she protested the District's decision to implement a

different method of special education instruction.[29]  "Merely because an employee's speech was made <u>at</u> work and <u>about</u> work does not necessarily remove that employee's speech from the ambit of constitutional protection."  <u>Thomas</u>, 548 F.3d at 1323.  The question is "whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was 'commissioned' by the employer."  *Id.*

The Supreme Court did not provide "a comprehensive framework for defining the scope of an employee's duties" in <u>Garcetti</u>, but rather emphasized that the inquiry was "a practical one."  <u>Garcetti</u>, 547 U.S. at 424.  In that case the Court considered the First Amendment claims of a deputy district attorney (Cebellos). He had prepared an internal office memorandum recommending the dismissal of a case because he believed an affidavit used to obtain a critical search warrant contained serious misrepresentations.  That memo and a second like it led to a heated meeting after which Ceballos was reassigned from his position, transferred and denied a promotion.  The Court determined that Ceballos "wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* at 421.  He was speaking in his role "as a prosecutor fulfilling a responsibility to advise

---

[29]*There is no evidence that defendants were aware that plaintiff conveyed her views to anyone other than District personnel.  District's Exhibit 1, pp.148-49.  (Plaintiff's Exhibit 028.001 reflects that she consulted with State Department of Education Personnel regarding the proper preparation of a letter of dissent, but does not indicate she complained to them about the District's method of providing special education services.)  Plaintiff's testimony regarding her discussions outside the workplace is too conclusory and non-specific to be considered as evidence that she engaged in protected speech in those conversations.  District's Exhibit 1, pp. 38-39.  See <u>Sarkar v. McCallin</u>, 636 F.3d 572, 576 (10th Cir. 2011).  However, the fact that a plaintiff did not express her concerns publicly is not dispositive.  <u>Garcetti</u>, 547 U.S. at 420.  "Employees in some cases may receive First Amendment protection for expressions made at work."  Id.*

his supervisor about how best to proceed with a pending case ...." *Id.* at 421.

Since <u>Garcetti</u> the Tenth Circuit has "taken a 'broad' view of the meaning of speech that is 'pursuant' to an employee's 'official duties.'" <u>Thomas</u>, 548 F.3d at 1324. It can include speech that "'deals with activities that the employee is not expressly required to perform.'" *Id.* (quoting <u>Brammer-Hoelter v. Twin Peaks Charter Academy</u>, 492 F.3d 1192, 1203 (10th Cir.2007)). "The guiding principle is that speech is made pursuant to official duties if it involves 'the type of activities that [the employee] was paid to do.'" <u>Chavez-Rodriguez v. City of Sante Fe</u>, 596 F.3d 708, 713 (10th Cir. 2010) (quoting <u>Green v. Bd. of County Comm'rs</u>, 472 F.3d 794, 801 (10th Cir. 2007). No single factor is dispositive. *Id.* The court "take[s] a practical view of all the facts and circumstances surrounding the speech and the employment relationship." <u>Brammer-Hoelter</u>, 492 F.3d at 1204.

The court concludes plaintiff's speech was akin to that of Cebellos and was undertaken in the course of her official duties. She was speaking out seeking assurance that Tulakes was "meeting all the legal requirements of the state and federal guidelines." District's Exhibit 12. As a special education teacher, plaintiff was expected to ensure compliance with state and federal law. District Fact #2 (undisputed). When asked whether plaintiff believed it was part of her job "to point out to the administration [her] concerns about potential legal violations" resulting from following the administration's directives, she replied: "[Y]es, I do believe it is a job of a special ed teacher." District's Exhibit 1, pp. 166-67. *See* District's Exhibit 4 ("Your chief concern seems to enter around your desire to be in compliance with state and federal guidelines."). Like Cebellos, plaintiff did not go beyond

her supervisors when expressing her concerns. She did "not communicat[e] with newspapers or her legislators or perform[] some similar activity afforded citizens." Green, 472 F.3d at 800. Instead, she reported to those within her normal chain of command about a matter committed to her care – meeting the needs of special education students.

The court concludes plaintiff's criticisms of the District's educational method was "speech that owe[d] its existence to [plaintiff's] professional responsibilities." Garcetti, 547 U.S. at 421. "Nothing in the record suggests Plaintiff criticized [the District] in [her] capacity as a citizen ...." Sarkar v. McCallin, 636 F.3d 572, 575 (10th Cir. 2011). See Chavez-Rodriguez, 596 F.3d at 716 (concluding speech at banquet was undertaken pursuant to plaintiff's official duties and not as a private citizen, when discussion, though not an explicit job requirement, stemmed from plaintiff's job responsibilities and was "of the type she was paid to perform"); Brammer-Hoelter, 492 F.3d at 1204 (plaintiffs' statements regarding school's curriculum and pedagogy were "made pursuant to Plaintiffs' official duties and could be freely regulated"); Green, 472 F.3d at 800-01 (speech/conduct not protectable under First Amendment even though employee was "trying to focus attention on apparently misguided actions or improper situation[]").

Even if plaintiff's First Amendment claim survived the first three steps of the Garcetti-Pickering analysis, it would nonetheless fail at the fourth step because of lack of evidence of causation.[30] At least insofar as is indicated by the parties' submissions, the last exchange

---

[30]*Although the jury ordinarily resolves step four, the court can consider it when there is no evidence in the record from which a trier of fact could reasonably conclude that the employee's*

between plaintiff and her supervisors regarding the change in instructional approach was in November 2007. Plaintiff's reassignment occurred six months later, in May 2008. "Although protected conduct closely followed by adverse action may justify an inference of retaliatory motive, the mere temporal proximity of Plaintiff's protected speech to the adverse action is insufficient, without more, to establish retaliatory motive." Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d 1223, 1236 (10th Cir.2009) (quoting Baca v. Sklar, 398 F.3d 1210, 1221 (10th Cir.2005)). Evidence that might "be relevant in establishing a retaliatory motive" can include the fact that "the employer expressed opposition to the employee's speech, or that the protected speech implicated the individual defendant in wrongdoing." Id. (internal quotations and citation omitted). Here, however, plaintiff was specifically instructed that she could continue to express her disagreement with the District's instructional method by attaching letters of dissent to the IEP's. Also, although plaintiff believed the District might be violating federal or state law, there is no indication in the record that her superiors thought that their actions or the model being implemented was contrary to law. Plaintiff has not met her burden of showing that a fact dispute exists as to whether her protected speech was a substantial motivating factor in the District's decision to reassign her.[31]

_____

speech was a motivating factor in the detrimental employment decision. See Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d 1223, 1236 (10th Cir.2009).

[31]Plaintiff's reassignment appears to be the only act qualifying as adverse action for purposes of her First Amendment claim. The Tenth Circuit has "noted on more than one occasion that some forms of retaliation may be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII." Couch, 587 F.3d at 1237 (internal quotations

As plaintiff's speech was undertaken pursuant to her official duties and not as a private citizen, and she failed to offer evidence demonstrating a material fact dispute as to the causation element of her First Amendment retaliation claim, the District and individual defendants are entitled to summary judgment on this claim, too.[32]

## Conclusion

It is clear plaintiff believes strongly in her view of the way special education services should be provided. The court does not doubt plaintiff's good faith and considerable passion in pursuing what she sees as the best way to provide services for those students in her charge.[33] She may well be correct in her view that the District's (or at least her former school's) approach to those services was wrong or not the best available. However, as noted above, it is not this court's job to resolve disputes as to whether the "inclusion" model, or the "pulling out" model, or some other theory of special education services is the best one. That is the sort of "business judgment" that employers may make so long as their decisions do not

---

*omitted).  However, while "certain types of less severe conduct can be the basis for a First Amendment claim," id., none of the asserted retaliatory conduct cited by plaintiff, such as a dispute about leave designation, see supra page 9, suffices.  See* Couch*, 587 F.3d at 1237 ("But 'we have never ruled that all [of an employer's acts], no matter how trivial, are sufficient to support a retaliation claim.'" )(quoting* Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1340 (10th Cir.2000)).  Plaintiff's transfer was the only action that plausibly could "'deter a reasonable person from exercising [her] ... First Amendment rights.'"  Id. at 1238 (quoting* Brammer-Hoelter*, 492 F.3d at 1208)).*

[32]*The individual defendants moved for summary judgment on plaintiff's First Amendment claim both on the merits and based on qualified immunity.  As the court concludes the claim failed on the merits, it need not address the qualified immunity defense.*

[33]*And notwithstanding her pro se status, plaintiff has pressed her concerns here with considerable skill.*

run afoul of the particular standards set out by the employment discrimination statutes or the First Amendment. For the reasons indicated, the court concludes plaintiff has not made the necessary showing to avoid summary judgment under those standards with respect to the claims asserted in this case.

Accordingly, defendants' motions for summary judgment [Doc. Nos. 56, 57] are **GRANTED**. Defendants' motion to strike plaintiff's surreply [Doc. #66] is **DENIED**.[34]

**IT IS SO ORDERED**.

Dated this 19th day of August, 2011.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[34]*In light of plaintiff's pro se status, the court considered both of her surreply briefs and the attached documents.*